# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

BARBARA BURACKER AND
ELIZABETH MCCROSSAN,

             Plaintiffs,

    v.

INTELICHART, LLC,

             Defendant.

Case No. 3:25-cv-622

JURY TRIAL DEMANDED

---

## FIRST AMENDED CLASS ACTION COMPLAINT

---

Plaintiffs Barbara Buracker and Elizabeth McCrossan, on behalf of themselves and all other similarly situated patients ("Plaintiffs"), upon personal knowledge as to Plaintiffs' own conduct and upon information and belief as to all other matters based upon investigation of counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Class Action Complaint against Defendant InteliChart, LLC ("Defendant" or "InteliChart"), state as follows:

### NATURE OF THE ACTION

1.      Plaintiffs, individually and on behalf of all members of the proposed class (the "Class Members") bring this action against InteliChart for surreptitiously divulging his Protected Health Information ("Protected Health Information" or "PHI")[1] to Google via Google's online marketing

---

[1] Under HIPAA, "Protected Health Information" means "individually identifiable health information: (1) Except as provided in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium."

systems, known as Google Analytics, when patients exchanged communications with their healthcare providers via Patient Portals provided by InteliChart (the "Patient Portals"). InteliChart did so without patients' knowledge, authorization, or consent.

2. InteliChart is one of the largest providers of health information technology services in the United States. InteliChart hosts online Patient Portals for healthcare providers across the country, which allow patients to manage their healthcare online by, *e.g.*, viewing medical records, scheduling appointments, and messaging members of their care team.

3. As a Patient Portal provider, InteliChart operates as a "business associate" under HIPAA, which requires InteliChart to maintain patients' Protected Health Information in a manner consistent with HIPAA regulations. In addition to HIPAA, InteliChart is obligated to maintain the confidentiality of Protected Health Information under state and federal law and InteliChart's own promises to patients.

4. Despite these obligations, and unbeknownst to patients, InteliChart deployed various Google digital marketing and automatic rerouting tools on its Patient Portals. Via these tools, InteliChart purposefully and intentionally disclosed patients' Protected Health Information to third parties who exploited the information and used it for advertising. By using these tools, InteliChart took patients' confidential communications and Protected Health Information and automatically sent them to Google—a clear violation of patients' reasonable expectations of privacy, their rights as patients,

---

45 C.F.R. § 160.103. HIPAA defines "Individually Identifiable Health Information" to mean "information that is a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.").

and their rights under federal and state law.

5. InteliChart's conduct violates reasonable expectations of patient privacy. InteliChart did not provide patients with any warnings that using its Patient Portals would result in InteliChart depositing Google cookies on patients' personal computing devices or divulging their Protected Health Information and the substance of their communications with their healthcare providers to Google and its advertising systems.

6. There is no dispute that InteliChart's conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin ("the Bulletin") reminding both covered entities and business associates alike of their patient privacy obligations "when using online tracking technologies."[2] HHS expressly stated that "[t]racking on user-authenticated webpages … such as a patient or health plan beneficiary portal" must comply with the HIPAA privacy rule and all information relating to such use by patients must be "protected and secured in accordance with the HIPAA Security Rule."[3] HHS further clarified that health information cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[4]

---

[2] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[3] *Id.*
[4] *Id.*

7.     Similarly, Google warns entities like InteliChart who provide password protected patient portals that Google Analytics should not be deployed on "authenticated" pages—*i.e.,* pages requiring patient logins:[2]

> ## Can Google Analytics be used in compliance with HIPAA?
>
> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin ⧉ provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
>
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
>
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..
>
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

8.     Despite Plaintiffs' and Class Members' reasonable expectations that InteliChart would not share their Protected Health Information with Google via the use of marketing tools, InteliChart routinely divulged patients' information anyway.

9.     InteliChart did so through a multi-step process.

    a.     *First*, InteliChart required patients to have first-party cookies enabled to access its "secure" Patient Portals. This requirement is a general security and usability standard for "authenticated" websites. First-party cookies are typically used to confirm that the user is who they say they are when they sign-in—and to keep them signed-in as they exchange

communications within "authenticated" portions of a website.

b.   *Second*, InteliChart placed, enabled, or permitted the placement of Google source code on its Patient Portals and inside the patient portal mobile application that it made available to the public.

c.   *Third*, when a patient visited InteliChart's Patient Portals or clicked to login to a Patient Portal, the Google source code that InteliChart deployed enabled Google cookies to be placed on a patient's communications device that were disguised as "first-party" cookies belonging to InteliChart or the healthcare provider. By disguising the Google cookies, InteliChart prevented patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because InteliChart required the use of first-party cookies to access the portal, InteliChart assured that all patients who entered its Patient Portals would have the Google cookies placed on their device.

d.   *Fourth,* the Google source code that InteliChart deployed in its Patient Portals both captured patients' communications and commanded patients' computing devices to re-direct and divulge patient and device identifiers and the content of patient communications to Google via its various marketing services.

e.   *Fifth,* both InteliChart and Google used this information for marketing purposes.

10.   InteliChart did not make any attempt to obtain Plaintiffs' or Class Members' consent for sharing patients' protected PHI with Google nor does InteliChart have express written consent from Plaintiffs or any Class Member to share their Protected Health Information with Google.

5

11.     InteliChart's unauthorized disclosures violate both state and federal law. Moreover, through its unauthorized disclosures, InteliChart breached its fiduciary duties, was unjustly enriched, and committed multiple torts and crimes, including criminal violations of the Electronic Communications Privacy Act.

12.     As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist").

13.     InteliChart's conduct caused damage to Plaintiffs and Class Members:

    a.     Sensitive and confidential Health Information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.     InteliChart eroded the essential confidential nature of the provider-patient relationship;

    c.     InteliChart took something of value (*i.e.*, personal and private Health Information and other personal data), from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' or Class Members' knowledge, informed consent, or authorization, and without sharing the benefit derived; and

    d.     InteliChart's actions diminished the value of Plaintiffs' and Class Members' Health Information and other personal data.

## PARTIES TO THE ACTION

14.     Plaintiff Barbara Buracker is a resident of Pender County, North Carolina, and has been a patient of ▮▮▮▮▮▮▮▮▮▮. Plaintiff has been a registered user of the InteliChart Patient

Portal operated by InteliChart and has used it to review medical records and doctor notes, including records related to treatment for a ████████████████.

15.     Plaintiff Elizabeth McCrossan is a resident of New Hanover County, North Carolina, and has been a patient of █████████████.  Plaintiff has been a registered user of the InteliChart Patient Portal operated by InteliChart and has used it to review medical records and doctor notes, including records related to her treatment by her primary care physicians that she has seen through █████████████.

16.     Defendant InteliChart, LLC is a North Carolina corporation with its principal place of business at 11035 Golf Links Drive, Charlotte, North Carolina 28271.  InteliChart supplies electronic health record ("EHR") products and provides Patient Portals for healthcare providers nationwide. InteliChart manages more than 70 million unique patient charts.  InteliChart encourages patients to use its InteliChart Patient Portal, which allows patients to review test results, communicate with their doctors, confirm appointments, pay bills, fill out forms, research health conditions, and review their doctor's notes and their medical histories.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class Members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Electronic Communications Privacy Act ("ECPA").

18.     This Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because they are so related to Plaintiffs' federal claims that they form part of

the same case or controversy under Article III of the United States Constitution.

19.    This Court has personal jurisdiction over InteliChart because InteliChart has sufficient minimum contacts with this District in that it operates and markets its services throughout this District.

20.    Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

**A.    InteliChart Systematically and Routinely Disclosed Patients' Protected Health Information to Third Parties, including Google.**

21.    Plaintiffs and Class Members are patients who have used password-protected InteliChart Patient Portals.

22.    Healthcare providers and their business associates like InteliChart have fiduciary, common law, and statutory duties to protect the confidentiality of their patients' Protected Health Information and to refrain from making unauthorized disclosures to third parties about their patients' Protected Health Information.

23.    Medical patients like Plaintiffs and Class Members have a legal interest in preserving the confidentiality of their communications with healthcare providers.

24.    Patients also have reasonable expectations of privacy that their Protected Health Information will not be disclosed to third parties without their express written consent and authorization.

25.    InteliChart expressly and impliedly promised patients that it would maintain and protect the confidentiality of patient Protected Health Information and communications, consistent with its legal obligations.

26.    InteliChart operates Patient Portals for more than 1,000 healthcare providers and healthcare systems across the United States, including Wilmington Health, the East Valley Community Health Center, Northeast Valley Health Corporation, Heights Pediatrics, and Princeton Medical Group.

27.    InteliChart encourages patients to use digital tools on its Patient Portals to seek and receive health care services.

28.    InteliChart's Patient Portals are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, reviewing medical records and lab results, exchanging communications with providers, and renewing prescriptions. Source code on InteliChart's Patient Portals causes these communications to be intercepted and disclosed to Google.

29.    Notwithstanding patients' reasonable expectations of privacy and InteliChart's legal duties, InteliChart systematically and routinely disclosed patients' Protected Health Information, including the contents of patients' communications with their healthcare providers, via automatic data collection mechanisms embedded in its Patient Portals. InteliChart did this without Plaintiffs' or other patients' knowledge, authorization, or consent. In doing so, InteliChart continuously and systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to third parties like Google.

30.    Plaintiffs and Class Members provided their private Protected Health Information through InteliChart's Patient Portal with the reasonable understanding that InteliChart would secure and preserve the confidentiality of that information, consistent with its legal obligations.

31.    The Protected Health Information of Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties that utilize the information for retargeting.

32.    InteliChart intentionally incorporated analytics tracking tools into its Patient Portal and never disclosed to Plaintiffs or Class Members that it shared their Protected Health Information with Google and other third parties. Nor did InteliChart inform patients that it was permitting Google to exploit their Protected Health Information for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their Protected Health Information was being surreptitiously transmitted

to Google when they visited InteliChart's Patient Portal.

33.     The tracking mechanisms that InteliChart used on its Patient Portals are—by design—invisible to patients. Once integrated into a website, the tracking tools are executed in the background, meaning that they can operate in the background on a website or a mobile application without ever alerting website users of their presence. Further, because of how these tools are designed, they are able to collect, store, and transmit user data in ways that cannot be blocked by "ad blocker" software or by a user refusing to give their consent to data being collected.

34.     Every patient who logged into the InteliChart Patient Portal did so through a login page provided by InteliChart.



35.     Every time that Plaintiffs and Class Members logged into the InteliChart Patient Portal during the class period, InteliChart shared their logins and patient status with Google via the Google Analytics technology that InteliChart deployed on the login button.

36.     InteliChart also deployed Google Analytics on every page inside its Patient Portal.

37.     When Plaintiffs exchanged communications through the InteliChart Patient Portal, InteliChart caused the contemporaneous interception and redirection of the precise content of Plaintiffs' communications with InteliChart and their doctors to be sent to Google. The communications that InteliChart disclosed included detailed content, including Plaintiffs' physicians, the physicians' specialties, Plaintiffs' medical conditions, and location information, along with personal identifiers such as IP addresses, browser fingerprints, and cookie identifiers. By design, Google received and recorded the exact contents of these communications before the full response from InteliChart and/or Plaintiffs' doctors had been rendered on the screens of their devices and while the communications remained ongoing.

38.     By using data collected by analytics tracking tools, Google is able to connect a website user's data to their real-world identity by linking their data to profiles maintained by Google, including user's Google accounts.

39.     Once Google connects a user's data to their real-world identity, Google processes, analyzes, and assimilates that data so that it can be sold to online advertisers and funneled back to clients like InteliChart in the form of aggregated analytics data.

40.     Online advertisers—taking advantage of Google's trove of personally identifying data—are able to create marketing campaigns that target their advertisements towards specific users and their specific medical conditions based on the data that InteliChart shared with Google.

41.     InteliChart did not warn or otherwise disclose to Plaintiffs and Class Members that InteliChart bartered their Protected Health Information to Google and other third parties for marketing purposes.

42.     Plaintiffs and Class Members never consented, agreed, or otherwise authorized InteliChart to disclose their Protected Health Information to advertising companies like Google.

11

43.     Upon information and belief, InteliChart intercepted and disclosed at least the following Protected Health Information to third parties including Google:

a.      Plaintiffs' and Class Members' status as patients;

b.      Plaintiffs' and Class Members' use of InteliChart's Patient Portals;

c.      Information related to Plaintiffs' and Class Members' requests for, receipt of, and communications regarding medical treatment, including their review of lab and test results, medications, appointments, and communications with their treating physicians.

44.     InteliChart interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including Google Analytics) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' Protected Health Information to Google and other third parties.

45.     InteliChart also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their Protected Health Information to third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its Patient Portals were safe and secure, (3) failing to remove or disengage software code that was known and designed to share Plaintiffs' and Class Members' Protected Health Information with third parties if placed inside InteliChart's Patient Portals, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' Protected Health Information to third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that InteliChart was routinely bartering their Protected Health Information to Google, and (6) otherwise ignoring InteliChart's common law and statutory obligations to protect the confidentiality of Plaintiffs' and Class Members' Protected Health Information.

46.     The transmission of Plaintiffs' and Class Members' Protected Health Information to

Google was not necessary for InteliChart's Patient Portals or other services to function. Indeed, the entire publicly stated purpose of those services was to facilitate the provision of healthcare to Plaintiffs and other patients, and as described InteliChart was under unambiguous legal obligations to ensure that patients' Protected Health Information transmitted in that process remained confidential. Given its legal obligations, InteliChart did not and could not have had any permissible purpose for placing Google source code inside its Patient Portals. InteliChart's primary, secret, and improper purpose in doing so was, instead, to allow InteliChart and Google to exploit patient Protected Health Information and communications for advertising and marketing purposes.

B.    **InteliChart Set Up its Patient Portals to Permit the Surreptitious Capture and Disclosure of Patients' Protected Health Information to Third Parties.**

47.    InteliChart's Patient Portals are used by numerous healthcare providers around the United States and have been throughout the Class Period.

48.    The Patient Portals provide patients and providers:

a.    the ability to send and receive electronic communications;

b.    computer storage of electronic health record and communications information; and

c.    processing services for electronic information.

49.    When a patient went to a InteliChart Patient Portal to "Sign In" during the Class Period, Google source code that InteliChart placed or permitted to be placed on its Patient Portals would deposit "first-party" cookies named _ga, _gid, _gcl, and _au on the patient's computing device. As "first party" cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to InteliChart, which will permit them to be placed on the patient's device. In fact, however, these are Google cookies, not InteliChart cookies.

50.    By disguising the Google cookies as belonging to InteliChart instead of Google, InteliChart circumvents attempts to block such tracking.

13

51.     Further, InteliChart **requires** patients to have first-party cookies enabled to access its Patient Portals, which further assured that InteliChart could deposit Google cookies on patient computing devices while patients are on and inside Patient Portals.

52.     InteliChart's software permitted the deployment of "custom analytics scripts" within the Patient Portals including, for example, Google Analytics source code (collectively, "Google source code"), through which patient identifiers and communications content are divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within InteliChart's Patient Portals.

53.     InteliChart knowingly and secretly deployed Google source code on Patient Portal login pages and inside its Patient Portals.

54.     Further, InteliChart actively encouraged its healthcare clients to deploy Google marketing tools to drive patient engagement.

55.     In short, the Google source code that InteliChart deployed on its Patient Portals deposited Google cookies on patients' browsers; disguised Google cookies as being associated with InteliChart rather than Google; and commanded Plaintiffs' and Class Members' browsers to re-direct identifiers and communications content on and inside the Patient Portals to Google. Further, InteliChart implemented multiple measures to ensure that Plaintiffs and Class Members would not and could not prevent all this from taking place.

56.     The Google source code InteliChart deployed inside its Patient Portals intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Health Information to Google, including at least the following identifiers:

a.     Patient IP addresses;

b.     Unique, persistent patient cookie identifiers;

c.     Device identifiers;

d.     Account numbers;

e.     URLs;

f.     Other unique identifying numbers, characteristics, or codes; and

g.     Browser-fingerprints.

50.     The Google source code InteliChart deployed inside its patient portals intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Health Information to Google, including at least the following communications content:

     a.     Actions to log in to Patient Portals;

     b.     Actions to sign up for Patient Portals;

     c.     Actions to log out of Patient Portals;

     d.     Actions taken inside Patient Portals;

     e.     Any actions that patients take on their healthcare providers' properties while logged in to Patient Portals, including searching or exchanging communications about a specific doctor, condition, or treatment.

51.     The amount of data collected is significant. When patients interacted with its Patient Portals, InteliChart disclosed a full-string, detailed URL to Google, typically containing the name of the website, folder, and sub-folders on the webserver; the name of the precise file requested; and the exact contents of the patients' communications. For example, when a patient clicks on a link to view a specific test result or make an appointment with a specific physician, Google receives the precise text of the patient's query.

52.     As a result of the foregoing, Google consistently received throughout the Class Period the precise text of communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, tests, medications, payments, and registrations.

15

53.     The contents of patients' communications with their treating physicians plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with InteliChart's Patient Portals. 45 C.F.R. § 160.103. Worse, no matter how sensitive the area of the portal site that a patient reviewed, the referral URL was acquired by Google along with other Protected Health Information embedded in patients' interactions with the Patient Portals.

54.     The nature of the collected data is important. InteliChart's unauthorized disclosures resulted in Google obtaining the comprehensive history of individual patients, no matter how sensitive their medical condition. Google was then able to correlate that history with other known information regarding the user, including their identity, their prior searches, the time of day, and other user actions. This process resulted in Google acquiring a vast repository of personal data about patients that was then used for marketing purposes—all without patients' knowledge, consent, or authorization, or any further action by patients.

55.     By design, Google received the exact contents of patients' communications while they were in storage in InteliChart's systems but before the full response from the healthcare providers had been rendered on the screen of patients' devices.

**C.     What Happened When Patients Communicated with InteliChart's Patient Portals.**

56.     When patients logged in to InteliChart's Patient Portals either through a website or via the InteliChart mobile application, InteliChart re-directed the precise content of the patients' communication and patients' identifiers to Google at various Google domains.

57.     When patients signed in or exchanged communications inside the portal, InteliChart immediately placed the content of that communication in storage within the Patient Portals.

58.     InteliChart's immediate storage of the contents (and the identity of the person who was exchanging the communication) is required by federal law. *See* 45 C.F.R. § 164.312.

59.     After InteliChart had stored the content of the communication, but while the Patient

16

Portal exchange with patients was still occurring, InteliChart re-directed patients' information to the following Google domain: www.google-analytics.com.

60.     The patient identifiers that were re-directed to Google-Analytics include:

a.     The patient's IP address;

b.     The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device; and

c.     Google cookies disguised as InteliChart's cookies which serve as device identifiers and that Google connects to patients. These cookies include but may not be limited to the _ga and _ga_HK3FDYQCRR cookies.

61.     Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed in to a Google Account. Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes protected health information protected by federal law.

62.     Further if a Google Account holder has signed in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the Patient Portals, then InteliChart will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, InteliChart enables Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

**D.     InteliChart's Actions Permit Google to Connect Patients' Data Across Domains.**

63.     Google publicly states that it connects the data that advertisers and publishers (like InteliChart here) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

64.     InteliChart used the same tools and source code throughout all its Patient Portals. Thus, the types of Google cookies deposited on patient devices and the types of health information and communications content disclosed (as explained above) occurred every time a patient logged into or took any action within the Patient Portals.

**E.     Google's Business Model: Exploiting Consumers' Personal Information for Profit.**

65.     By any measure, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

66.     Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[5]

67.     Google cookies provide personally identifiable data about patients who visit InteliChart's Patient Portals to Google.  InteliChart transmits personally identifiable Google cookie data to Google.

68.     Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like InteliChart, publicly stating:[6]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA

---

[5] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data- than-facebook-try-google-1524398401).

[6] Google, *HIPAA and Google Analytics,* https://support.google.com/analytics/answer/13297105?hl=en

requirements and does not offer Business Associate Agreements in connection with this service.

For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:

- Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.

- Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.

- Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.

- Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

69.    Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

70.    Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

    a.    "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[7]

    b.    "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other

---

[7] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https://policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).

information[.]"[8]

c.    "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[9]

d.    "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[10]

71.    Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

72.    Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[11]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including

---

[8] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).
[9] *Id.*
[10] *Id.*
[11] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https:/support.google.com/adspolicy/answer/143465?hl=en (archived from October 31, 2019).

remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …

You aren't allowed to do the following:

> ❌ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

73.     The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[12]

74.     Google refuses to sign business associate agreements ("BAA") with healthcare companies.

75.     After Google collects data that is transmitted to it by Google Analytics, Google analyzes and processes that data for use in selling advertising.

76.     Google also uses the data that it collects from tracking pixels to provide clients like InteliChart with analytics data that those clients use to bolster their marketing and advertising strategies. Clients like InteliChart also use the analytics data that they receive back from Google to optimize their websites.  InteliChart benefited financially from sharing Plaintiffs' and Class Members' Health Information via tracking pixels by receiving, among other things, better and more cost-effective marketing in exchange for patient data.

---

[12] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**F.      InteliChart Shared a Trove of Personally Identifiable Information with Google.**
**IP Addresses Are Personally Identifiable**

77.      An IP address is a number that identifies a computer or other device (such as a mobile phone) connected to the Internet.

78.      IP addresses are used to identify and route communications on the Internet.

79.      IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications and target those users with advertising using IP addresses.

80.      Under HIPAA, an IP address is considered personally identifiable information. *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

81.      Whenever a patient logged into or used InteliChart's Patient Portals, InteliChart caused the disclosure of the patient's IP addresses to Google, along with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

**Internet Cookies Are Personally Identifiable**

82.      In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

83.      Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's device when that person's web browser interacts with the server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

84.      Cookies are designed to and, in fact, most often do operate as means of

identification for Internet users.

85.     Cookies are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

86.     In general, cookies are categorized by duration and party.

87.     There are two types of cookies classified by duration:

     a.     "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

     b.     "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

88.     Cookies are also classified by the party that uses the collected data:

     a.     "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

     b.     "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits an InteliChart Patient Portal will typically also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are

23

not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

89.     Data companies like Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications to sell advertising that is customized to that person. To build individual profiles of Internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

90.     Traditionally, first- and third-party cookies were kept separate. An Internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although InteliChart can deploy source code that uses Google third-party cookies to help Google acquire and record the patient's communications, they are not permitted direct access to Google third-party cookie values. The reverse is also true: Google was not provided direct access to the values associated with first-party cookies set by InteliChart.

91.     Google designed a way to circumvent the same-origin policy so that third-party data companies can gain access to first-party cookies—and InteliChart adopted it.

92.     Javascript source code developed by third-party data companies and placed on a webpage by developers such as InteliChart can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

24

93.     Whenever a patient uses InteliChart's Patient Portals, InteliChart intercepts, uses, and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the Patient Portals.

94.     InteliChart's cookie disclosures include the deployment of cookie synching techniques through which InteliChart deposits Google cookies on patient computing devices by disguising the Google cookies as belonging to InteliChart.

95.     InteliChart then re-directs the disguised Google cookies to Google.

**Browser-Fingerprints Are Personally Identifiable**

96.     Browser-fingerprints are information collected about a computing device that can be used to identify the device.

97.     Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked.

98.     The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[13]

99.     In 2017, researchers showed that browser fingerprinting techniques can successfully

---

[13] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

identify 99.24 percent of Internet users.[14]

100.    Browser-fingerprints are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

101.    Whenever patients use InteliChart Patient Portals, InteliChart intercepts, uses and causes disclosures of data sufficient to form browser fingerprints with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

102.    Each of the individual data elements described above is personally identifiable on its own. However, InteliChart's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals and have developed sophisticated algorithms and infrastructure for doing so.

103.    InteliChart knowingly discloses information that allows Google and other advertisers to link Plaintiffs' and Class Members' Protected Health Information to their private identities and target them with advertising. InteliChart intentionally shared the Protected Health Information of Plaintiffs and Class Members with Google in order to gain access to the benefits of Google Analytics.

104.    The information Plaintiffs and Class Members provide to InteliChart via its Patient Portals website (which is then shared illegally with Google) can be combined with other information in Google's possession, like Plaintiffs' and Class Members' names, dates of birth, and phone numbers,

---

[14] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

to more effectively target Plaintiffs and Class Members with advertisements or sell their data to third parties.

105.    InteliChart knew that by embedding Google Analytics—a Google marketing tool—in its Patient Portals, it was permitting Google to collect, use, and share Plaintiffs' and Class Members' Protected Health Information, including sensitive medical information and personally identifiable data. InteliChart was also aware that such information would be shared with Google simultaneously with patients' interactions with its Patient Portals.  InteliChart chose to barter Plaintiffs' and Class Members' Protected Health Information to Google because it wanted access to Google Analytics and related Google tools.  That bargain financially benefited InteliChart and Google by betraying the rights of and InteliChart's obligations to Plaintiffs and Class Members.

**G.      InteliChart's Secret Google Source Code Improperly Disclosed Plaintiffs' and Class Members' Protected Health Information to Google Systematically Throughout the Class Period.**

106.    The intentional design and operation of InteliChart's Patient Portals to improperly and surreptitiously disclose Plaintiffs' and Class Members' Protected Health Information to Google, as described above and throughout this Complaint, was ongoing, consistent, and systematic throughout the Class Period.

107.    InteliChart's Patient Portals did in fact operate as described above and throughout this Complaint with respect to the named Plaintiffs in this matter.

108.    For example, Plaintiff Barbara Buracker used the InteliChart Patient Portal for multiple years in connection with healthcare provided by ██████████████ in connection with ████████████████████████████████████████████████████████████████████ ████████████████

109.    During that time, she has regularly logged in to the InteliChart Patient Portal and used the Patient Portal to confirm appointments, check test results, search for treatment information, and

message her doctors. When using the InteliChart Patient Portal, Ms. Buracker entered data inside the Patient Portal related to her treatment ██████████████████████, and her follow up care which was shared with Google via the analytics technologies that InteliChart deployed inside the Patient Portal. Ms. Buracker also messaged her doctors ████████████████ issues via the InteliChart Patient Portal. InteliChart also disclosed data about these communications to Google. InteliChart likewise sent Google data such as the location of Ms. Buracker's treaters, the names of her physicians, when she logged in and out of the Patient Portal, her patient status, when she reviewed appointment data, and her physicians' specialties.

110. After using InteliChart's patient portal, Ms. Buracker began receiving advertisements on her social media accounts for hernia treatments.

111. Likewise, Elizabeth McCrossan has also used the InteliChart Patient Portal for multiple years in connection with the healthcare provided by ████████████ in connection with the treatment that she has received from her primary care physician that she sees at ████████████. During that time, Plaintiff Ms. McCrosson regularly logged in to the InteliChart Patient Portal and used the Patient Portal to confirm appointments, check lab results, review doctor's notes, and search for treatment information.

112. When using the InteliChart Patient Portal, Ms. McCrosson entered data inside the Patient Portal related to her ongoing care, including data related to appointments that she made with her primary care physician and data related to the treatment that she received, such as ████████████ ████████████████████████████████████████████████████ ████████████ She also logged into her patient portal to review messages from her treating physicians about test results from her annual physicals. InteliChart shared all this data with Google, along with additional data such as when Ms. McCrosson logged in and out of her Patient Portal, her patient status, the hospital she was being seen at, the name of her primary care physicians, the location of her treaters,

28

and her physicians' specialties.

113.     Every time Plaintiffs accessed the InteliChart Patient Portal, InteliChart intercepted and shared their logins with Google, along with other Protected Health Information such as their patient status, their appointment scheduling, their prescription information, and the URLs of the pages they reviewed inside the Patient Portal, along with personally identifying information such as their IP addresses, browser fingerprints, and Google cookies. Such Protected Health Information, including Plaintiffs' patient status, her medical conditions, and when and where they sought treatment are specifically protected by HIPAA against unauthorized disclosure to third parties.

114.     While InteliChart could have sought consent from Plaintiffs and Class Members to intercept, collect, and share their Protected Health Information with Google, InteliChart chose not to because of the likelihood that the majority of patients would refuse. Instead, InteliChart surreptitiously deployed hidden analytics tracking tools it obtained from Google in an effort to circumvent patients refusing and/or blocking the exploitation of their Protected Health Information for advertising purposes.

115.     InteliChart intentionally deployed Google Analytics inside its Patient Portal (and thereby shared Plaintiffs' Protected Health Information with Google) in return for access to free marketing tools and aggregated data about how individuals interacted with its Patient Portal. InteliChart took the aggregated patient data it received back from Google and used that data to optimize its marketing and product designs, thereby increasing InteliChart's profitability at the expense of Plaintiffs and Class Members.

116.     InteliChart knowingly and intentionally deployed tracking technologies from Google for the purpose of secretly sharing patients' Protected Health Information with Google for commercial gain. InteliChart—not Google—controlled what source code was placed inside the InteliChart Patient Portal. InteliChart could have taken steps to have protected the confidentiality of Plaintiffs' Protected

29

Health Information by, for example, anonymizing all the data being shared with Google. InteliChart consciously chose not to take steps to protect patients against the unauthorized disclosure of his Protected Health Information via tracking technologies, such as using HIPAA-compliant analytics technologies.

117. InteliChart also consciously chose not to inform Plaintiffs and Class Members that their Protected Health Information was being shared with Google, because InteliChart wanted to reap the commercial benefits of sharing this data. InteliChart and its employees were aware that sharing Protected Health Information (i.e., health information coupled with prohibited identifiers such as IP addresses, URLs, and other identifiers) was illegal, but InteliChart chose to disclose such information to Google anyway.

118. InteliChart knew that Google would receive the contents of patients' private, care-related communications as a consequence of deploying Google Analytics. Indeed, by deploying Google Analytics inside a HIPAA protected patient portal, InteliChart ensured that Plaintiffs' and Class Members' Protected Health Information would be shared with Google without their consent.

119. Upon information and belief and the investigation of counsel, each Class Member had his or her interactions with the Patient Portals intercepted and shared with Google in a manner substantially similar to what occurred with the named Plaintiffs as detailed above, such that named Plaintiffs' claims are typical of those of the proposed Class as a whole.

**H.     Third Parties like Google Share the Data and Information Collected from Trackers Installed on Defendant's Website with Fourth Parties.**

120. In addition to using the data for their own purposes, the third parties that obtain patient data and information from trackers installed on Defendant's website further profit from Defendant's improper sharing practices by selling patients' data to fourth parties.

121. As one study found, "on average, companies that allow external sharing of [] data

30

Case 3:25-cv-00622-MOC-SCR     Document 17     Filed 11/14/25     Page 30 of 71

assets have data that has been exposed to 42 4th-party domains."[15]

122.    Consequently, a fourth party that did not have a tracker directly installed on the Defendant's website may obtain and use information collected via third-party trackers to provide direct advertisements to patients on the fourth party's platform.

123.    One common recipient of patients' collected data is Facebook.

124.    For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[16] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

125.    Facebook and Google both act as data brokers, meaning they collect data, compile it into datasets, and sell it to third parties.[17] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[18]

126.    Because of this, one company's tracker (e.g., Google Analytics) may collect

---

[15] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DOCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

[16] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

[17] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025).

[18] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (e.g., Facebook), which uses the information to advertise for various parties (like other healthcare institutions) on its own platform.[19] Alternatively, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (e.g., another healthcare institution), which uses the information to advertise for on other platforms (e.g., Facebook).[20] Or, one company's tracker (e.g., Google Analytics) may collect information, sell either the raw data or a compiled dataset to a third-party data broker (e.g., Acxiom or Oracle), which third party data broker sells the information to a fourth party (e.g., Facebook), which uses the information for still other parties' targeted advertising.[21] In any event, the basic idea and results are the same. Google Analytics tracks and discloses information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

127.    The information that data brokers like Acxiom and Oracle buy and compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

## I.    Plaintiffs' Personal Health Data that InteliChart collected, disclosed, and exploited is Plaintiffs' property, has economic value, and its illicit disclosure caused Plaintiffs harm.

128.    The value of data that companies like Google extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

129.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location

---

[19] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).
[20] *Id.*
[21] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.

information" were being sold for approximately "$0.50 per 1,000 people."[22]

130.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[23] This price is only increasing.  According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[24]

131.    In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

132.    Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[25]

133.    Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions on disclosure of such information under state and federal laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[26]

134.    Individuals can sell or monetize their own data if they so choose.  For example,

---

[22] https://ig.ft.com/how-much-is-your-personal-data-worth/

[23] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[24] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[25] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

[26] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

Facebook has offered to pay individuals for their voice recordings,[27] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[28]

135.    In June 2025, Google began soliciting individuals in the United States to participate in what Google termed a "Device Usage Study" offering to pay consumers $540 a year for access to the browsing data on their computers and mobile devices.

136.    Myriad other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[29]

137.    InteliChart was compensated for its disclosures of Plaintiffs' and Class Members' Health Information to Google in the form of enhanced analytics and marketing services.  Among other things, InteliChart used the analytics data that it received from Google to enhance the Patient Portal product it marketed and sold to healthcare systems.  In turn, Google used the Health Information it received from InteliChart to sell advertising to other third parties, targeted to the patients whom InteliChart was supposedly serving and protecting from privacy violations.

138.    InteliChart did not pay (or offer to pay) Plaintiffs and Class Members for their Protected Health Information before InteliChart shared this data with Google and other advertisers.

139.    InteliChart profited from Plaintiffs' and Class Members' information without ever intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made.

140.    InteliChart was unjustly enriched by its conduct.

**J.      Plaintiffs and Class Members Had a Reasonable Expectation of Privacy in Their**

---

[27] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounnuciations-app
[28] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[29]  https://www.creditdonkey.com/best-apps-data-collection.html;  *see also*  https://www.monetha.io/blog/rewards/earn-money-from-your-data/

**Protected Health Information.**

141.    As patients, Plaintiffs and Class Members had a reasonable expectation that InteliChart would not disclose their Protected Health Information or the content of their communications to third parties without their express authorization.

142.    As patients using InteliChart's Patient Portals, Plaintiffs and Class Members had a reasonable expectation that InteliChart would not disclose their Protected Health Information or the content of their communications to third parties without their express authorization.

143.    Plaintiffs' and Class Members' reasonable expectations of privacy in their Protected Health Information and communications exchanged with InteliChart are derived from multiple sources, including at least:

- InteliChart's status as Plaintiffs' and Class Members' healthcare Patient Portal provider;

- InteliChart's common law obligations to maintain the confidentiality of Health Information and communications;

- State and federal laws and regulations protecting the confidentiality of Health Information;

- State and federal laws protecting the confidentiality of communications and computer data;

- State laws  protecting against unauthorized  use  of  personal  means  of identification; and

- InteliChart's express and implied promises of confidentiality.

144.    It was reasonable for Plaintiffs and Class Members to assume that InteliChart's privacy policies were consistent with InteliChart's duties to protect the confidentiality of patients' Protected Health Information.

145.    Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

35

146. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

147. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[30]

148. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[31]

149. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

150. The concern about sharing Protected Health Information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of

---

[30] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[31] https://www.wired.co.uk/article/apple-ios14-facebook

datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[32]

151.     Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's Protected Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against. As a result of Defendant's disclosure of Plaintiffs' Protected Health Information to third parties without authorization via tracking technologies on its website, Plaintiffs and Class Members have suffered the following injuries:

     a.    Loss of privacy;

     b.    Unauthorized disclosure of their Protected Health Information;

     c.    Unauthorized access of their Protected Health Information by third parties;

     d.    Defendant benefitted from the use of Plaintiffs and Class Members' Protected Health Information without sharing that information with Plaintiffs and Class Members;

     e.    Repeated targeted advertisements from third and fourth parties on social media and other third-party websites, reflecting Plaintiffs and Class Members' Protected Health Information that was improperly disclosed and used;

     f.    Lost benefit of their bargain with Defendant, as Plaintiffs and Class Members did not receive the reasonable privacy and data security protections for which they paid;

---

[32] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

g.    Defendant enriched itself at Plaintiffs and Class Members' expense without sharing the revenue and profit attributable to collecting their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties);

h.    Defendant profited off of disclosing their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

i.    Defendant profited as a result of collecting their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties) through its revenues and profits attributable to serving and monetizing advertisements directed to Plaintiffs and Class Members;

j.    Plaintiffs and Class Members lost their ability to keep their Protected Health Information private or allow Defendant to track their data;

k.    Embarrassment, humiliation, frustration, and emotional distress;

l.    Decreased value of their Protected Health Information;

m.   Increased risk of future harm resulting from future use and disclosure of their Protected Health Information; and

n.    Statutory damages.

**K.    Plaintiffs' and Class Members' health information is protected against unauthorized disclosure by both state and federal law.**

152.    The confidentiality of Plaintiffs' and Class Members' Health Information is specifically protected by law.  *E.g.*, N.C. Stat. § 15A-287; 45 C.F.R. § 164.514.  The prohibitions against disclosing Health Information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes.  *E.g.*, 45 C.F.R. § 164.51.  Both state and federal law also restrict the use of Plaintiffs' and Class Members' Health Information,

including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

153.    InteliChart does not have a legal right to share Plaintiffs' and Class Members' Health Information with third parties without their written consent because this information is protected from such disclosure by law. 45 C.F.R. § 164.508. Nor is InteliChart permitted to disclose Plaintiffs' and Class Members' Health Information to advertising and marketing companies like Google without express written authorization from patients. 45 C.F.R. § 164.502(a)(5)(ii).

154.    Indeed, as discussed above, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting Health Information via tracking technology like Google Analytics without a patient's authorization and other protections like a business associate agreement with the recipient of the Protected Health Information. Among other things, HHS warned hospitals like those for whom InteliChart provides its Patients Portals that: "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of Health Information to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[33]

155.    InteliChart failed to obtain a valid written authorization from Plaintiffs or Class Members to allow the capture and exploitation of their Health Information and the contents of their communications for marketing purposes.

156.    Plaintiffs' and Class Members' Health Information is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

157.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part

---

[33] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[34]

158. Business associates like InteliChart must also comply with the privacy obligations imposed by HIPAA.[35]

159. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103; *see* n.1, *supra*.

160. In relevant part, PHI is defined as "individually identifiable health information . . . transmitted by electronic media [or] maintained in electronic media."

161. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

162. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be

---

[34] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.
[35] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privacy and Security Rules, like those described here, to business associates).

used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> . . .
>
> H. Medical records numbers;
>
> . . .
>
> J. Account numbers;
>
> . . .
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristics, or code…; and"
>
> the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

163. The HIPAA Privacy rule requires covered entities and business associates to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

164. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually

identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

165.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

166.    Courts have recognized that patient status is protected by HIPAA. *In re Meta Pixel Healthcare Lit.*, Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12 (N.D. Cal. Dec. 22, 2022) ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."); *id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA.").

167.    Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[36]

---

[36] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

168.     In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[37]

169.     In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on Patient Portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[38]

170.     The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement ("BAA") before utilizing their services:[39]

---

[37] Office of Civil Rights, Department of Health and Human Services, HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on- requirements-under-hipaa-for-online-tracking-technologies.html.

[38] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html   (last reviewed June 26, 2024) (emphasis added).

[39] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-

[T]racking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[40]

171.    HHS reiterated that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of HIPAA Rules."[41]

172.    As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[42]

**L.    On March 12, 2025, InteliChart modified its terms and conditions in an effort to avoid liability for its decade-long practice of sharing patient health data with Google.**

173.    Historically, InteliChart's Terms and Conditions gave Plaintiffs and Class Members no warning that InteliChart was regularly sharing their Protected Health Information

01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024, Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.
[40] *Id.*
[41] *Id.*
[42] *Id.*

44

with Google.

174.    Indeed, as recently as March 11, 2025, InteliChart's Terms and Conditions assured patients that "InteliChart will not share your information in a form that would be reasonably likely to be personally identifiable without your explicit and prior permission."

175.    Likewise, between March 2, 2020, and March 11, 2025, InteliChart's Terms and Conditions promised patients that "[t]he security of your information is of utmost importance to InteliChart."  InteliChart further promised in these Terms and Conditions that "InteliChart will not share your information in a form that would be reasonably likely to be personally identifiable without your explicit and prior permission."  InteliChart also promised that any vendor that it shared patients' data with would comport with "applicable law" and "InteliChart's HIPAA Policies and Procedures and any related internal privacy and security policies."

176.    InteliChart broke all those promises by regularly sharing Plaintiffs' and Class Members' Protected Health Information with Google without Plaintiffs' and Class Members' consent.  Among other things, InteliChart disclosed individuals' (1) status as medical patients, (2) their communications with their doctors, (3) information about their appointments, the location of their treatments, and their specific medical providers, (4) the times that patients logged in and out of the Patient Portal, (5) when patients paid bills, and (6) details related to their specific medical conditions and treatments.  Sharing this Protected Health Information not only violated HIPAA but it also violated InteliChart's own internal privacy policies.

177.    Nothing in InteliChart's Terms and Conditions explained or disclosed to patients that InteliChart would disclose their Protected Health Information to Google so that Google could target them with advertising related to the specific medical conditions and treatments that patients disclosed when interacting with InteliChart's Patient Portal.

178.    On March 12, 2025, in an effort to avoid suffering any legal liability for its decade-

long practice of sharing patient data with Google, InteliChart amended its Terms and Conditions to require any patient who accessed its Patient Portals going forward waive their rights to participate in a class action and submit all their claims to binding arbitration. After March 12, 2025, patients who attempted to access their medical records inside InteliChart's Patient Portals were required to "click" to accept these new Terms and Conditions before InteliChart would permit them to take any actions inside the patient portal (such as reviewing their medical records, communicating with their doctors, or confirming appointments). No consideration was given by InteliChart to patients for this unilateral (and substantive) change to the terms of the contract between themselves and InteliChart in return for patients' wavier of their right to a jury trial and their right to participate in a class action.

179.    Plaintiffs Jane Doe and Janet Doe have never accepted the March 12, 2025, Terms and Conditions and are not parties to the revised InteliChart agreement.

## TOLLING, CONCEALMENT, AND ESTOPPEL

180.    The applicable statutes of limitation have been tolled because of InteliChart's knowing and active concealment and denial of the facts alleged herein.

181.    InteliChart seamlessly incorporated trackers into its Patient Portals, providing no indication to Plaintiffs and Class Members that they were being tracked for marketing purposes. InteliChart had knowledge that its Patient Portals incorporated tracking technologies yet failed to disclose that by interacting with the Patient Portals, Plaintiffs' and Class Members' Protected Health Information would be intercepted, collected, used by, and disclosed to third parties.

182.    Plaintiffs and Class Members could not, with due diligence, discover the full scope of InteliChart's conduct, because there were no disclosures or other indication that they were interacting with Patient Portals employing Google Analytics or other tracking technologies.

183.    All applicable statutes of limitation have also been tolled by operation of the discovery

rule and the doctrine of continuing tort. Additionally, InteliChart was under a duty to disclose the nature and significance of its data collection practices but did not do so. InteliChart is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

184. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

185. Plaintiffs bring this action as a nationwide class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> During the fullest period allowed by law, all patients in the United States who logged into the Patient Portal provided by InteliChart where Google Analytics was deployed between who are not parties to the modified March 12, 2025, Terms and Conditions agreement promulgated by Intelichart via its Patient Portal.

186. Excluded from the Class are InteliChart and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

187. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

188. **Numerosity—Federal Rule of Civil Procedure 23(a)(1)** – Class Members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of InteliChart.

189. **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)** – Common questions of law and fact exist and predominate over questions affecting only individual Class Members. These common legal and factual questions include the following:

   a.     Whether InteliChart's practices relating to disclosures of Plaintiffs' and

47

Class Members' Protected Health Information to third parties were intentional;

b. Whether InteliChart profited from disclosures to the third parties;

c. Whether InteliChart's conduct violates the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* and 18 U.S.C. § 2701, *et seq.*;

d. Whether InteliChart's practices constitute an unauthorized intrusion upon seclusion;

e. Whether InteliChart's practices constitute identity theft;

f. Whether InteliChart's practices constitute a breach of fiduciary duty;

g. Whether InteliChart's practices constitute tampering with computer data;

h. Whether InteliChart's practices constitute unjust enrichment;

i. Whether placement of the Google cookies disguised as belonging to InteliChart on Plaintiffs' and Class Members' computing devices is a highly offensive intrusion upon seclusion;

j. Whether InteliChart's conduct harmed and continues to harm Plaintiffs and Class Members, and if so, the extent of the injury;

k. Whether and to what extent Plaintiffs and Class Members are entitled to damages and other monetary relief;

l. Whether and to what extent Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

m. Whether and to what extent Plaintiffs and Class Members are entitled to attorneys' fees and costs.

190. **Typicality—Federal Rule of Civil Procedure 23(a)(3)** – Plaintiffs' claims are

typical of the claims of the Class and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other Class Members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and Class Members are patients who used InteliChart Patient Portals and are victims of InteliChart's unauthorized disclosures to third parties. Plaintiffs' and Class Members' claims are based on InteliChart's wrongful conduct and unauthorized disclosures.

191. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)** – Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

192. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)** – InteliChart acted or refused to act on grounds generally applicable to Plaintiffs and the Class Members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

193. **Superiority—Federal Rule of Civil Procedure 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against InteliChart. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no

49

unusual management difficulties under the circumstances here.

194. Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

    a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for InteliChart;

    b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c. InteliChart has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

## COUNT I

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1)** *et seq.*
**Unauthorized Interception, Use, and Disclosure**

191. Plaintiffs, individually and on behalf of the other Class Members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

192. Plaintiffs bring these claims on behalf of themselves and all members of the Class.

193. Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, also known as the Wiretap Act, provides a private cause of action against any person who intercepts an electronic communication.

194. The ECPA protects individuals against eavesdropping committed with an improper

purpose.

195.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

195.    Plaintiffs' and Class Members' communications via Patient Portals, including their communications with their treating physicians, are covered communications under the ECPA.

196.    The ECPA protects both the sending and receipt of electronic communications.

197.    The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

198.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

199.    The transmissions of data between Plaintiffs and Class Members, on the one hand, and their healthcare providers' Patient Portals, which are hosted by InteliChart, on the other, qualify as communications under the ECPA.

200.    "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

51

201.    "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

202.    The "contents" of Plaintiffs' and Class Members' electronic communications included at least:

    a.    the parties to the communications;

    b.    the precise text of their search queries;

    c.    personally identifiable information such as their IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

    d.    the precise text of their communications about specific doctors;

    e.    the precise text of their communications about specific medical conditions;

    f.    the precise text of their communications about specific treatments;

    g.    the precise text of their communications about scheduling appointments with medical providers;

    h.    the precise text of their communications about billing and payment;

    i.    the precise text of specific buttons on InteliChart's portal that they clicked to exchange communications, including Logins, Registrations, Requests for Appointments, and other buttons;

    j.    the precise dates and times when they clicked to Log-In on InteliChart's portal;

    k.    the precise dates and times when they visited InteliChart's portal;

    l.    information that is a general summary or informs third parties of the general subject of communications that InteliChart sent back to them in

response to requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m.  any other content that InteliChart has aided third parties in scraping from webpages or communication forms in its Patient Portals.

203.  Plaintiffs' and Class Members' communications with their healthcare providers via InteliChart constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a.  Plaintiffs and Class Members' personal computing devices;

b.  Plaintiffs and Class Members' web browsers;

c.  Plaintiffs and Class Members' browser-managed files;

d.  Google Analytics;

e.  Internet cookies;

f.  InteliChart's computer servers; and

g.  Third-party source code used by InteliChart.

204.  Whenever Plaintiffs and Class Members interacted with InteliChart's Patient Portals, InteliChart, through the source code it embedded and ran on its Patient Portals, intentionally intercepted and divulged the contents of Plaintiffs and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

205.  Via the Google Analytics source code that it embedded and ran on its Patient Portal, InteliChart intentionally used, endeavored to use, and procured another person to use by bartering Plaintiffs' and Class Members' Protected Health Information to Google in return for advertising and marketing benefits without the knowledge or consent of Plaintiffs and Class Members.

206.    Via the Google Analytics source code that InteliChart deployed and ran on its Patient Portal, InteliChart intercepted and disclosed Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

207.    Without Plaintiffs' and Class Members' knowledge or consent, InteliChart acquired the content of Plaintiffs' and Class Members' communications while they were still exchanging communications with their healthcare providers inside the Patient Portal. InteliChart then caused these same communications to be disclosed to Google and third parties in return for marketing and advertising benefits.

208.    In violation of 42 U.S.C. § 1320d-6, InteliChart knowingly disclosed "individually identifiable health information to another person"—i.e., Google.  InteliChart further violated 42 U.S.C. § 1320d-6 by intentionally disclosing Plaintiffs' and Class Members' Protected Health Information to Google for the purpose of obtaining "commercial advantage" over its rivals in the marketplace such as Epic, Athena Health, and Cerner Health.  Specifically, InteliChart shared Plaintiffs' and Class Members' Protected Health Information with Google in return for free advertising and marketing tools from Google, along with aggregated patient data, that InteliChart used to optimize its Patient Portals and marketing campaigns, so that InteliChart could increase its profitability.  By exploiting Plaintiffs' and Class Members' Protected Health Information in this manner, InteliChart hoped to take market share away from its business rivals in the patient portal market.

209.    Google, in turn, used the Protected Health Information it received from InteliChart to sell targeted advertising to other third parties.  While that bargain may have enriched Google and InteliChart, it came at the expense of Plaintiffs and Class Members.

210.    When a patient makes contact with an InteliChart Patient Portal to exchange

communications with his or her health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and the Patient Portal server. The line remains open, and communications continue to flow back and forth from the patient's communications device and InteliChart's servers. The patient's communications with his or her healthcare provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and InteliChart's servers, InteliChart has also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

211.    InteliChart was not a party to many of the communications that it intercepted and disclosed.  For example, when Plaintiffs and Class Members sent messages to their health care providers or paid their healthcare providers bills, they were not communicating with InteliChart. Rather, Plaintiffs and Class Members were communicating directly with their doctors without any knowledge that InteliChart was secretly intercepting, recording, and disclosing their communications.

212.    InteliChart's conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

    a.    Cookies, including the Google cookies disguised as InteliChart's cookies;

    b.    Healthcare providers' web servers;

    c.    Google's web servers;

    d.    InteliChart's web servers; and

    e.    The Google source code described herein.

213.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

214.    Neither InteliChart nor Google were parties to Plaintiffs' and Class Members'

communications with their healthcare providers.

215.    But even if InteliChart was a party to the communications, InteliChart is still liable under the ECPA because it acted with the purpose of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

      a.      A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data;

      b.      A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."; and

      c.      A knowing breach of InteliChart's fiduciary duties to Plaintiff and the Class.

216.    InteliChart accessed and obtained Plaintiffs' and Class Members' Protected Health Information for the purpose of committing the crimes and torts described herein. More specifically, InteliChart intercepted Plaintiffs' and Class Members' communications so it could share those communications with Google and other third parties in return for advertising and marketing benefits. This intended and intentional disclosure violated both federal and state laws as set out above. InteliChart would not have been able to obtain these advertising or marketing services if it had complied with those laws.

217.    InteliChart acted without Plaintiffs' or Class Members' consent.

218.    InteliChart acted without the consent of Plaintiffs' or Class Members' healthcare providers.

219.    Although Plaintiffs and Class Members consented to InteliChart acquiring their

Protected Health Information for purposes of providing medical care and access to their health records, Plaintiffs and Class Members did not consent to InteliChart acquiring their Protected Health Information for purposes of re-directing it to Google or exploiting it for marketing purposes.

220.     As such, Defendant cannot viably claim any exception to ECPA liability.

221.     As a direct and proximate result of InteliChart's violation of the ECPA, Plaintiffs and Class Members were damaged by InteliChart's conduct:

    a.     InteliChart harmed Plaintiffs' and Class Members' interest in privacy;

    b.     Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is private no longer;

    c.     InteliChart eroded the essential confidential nature of the provider-patient relationship;

    d.     InteliChart took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit;

    e.     Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included their healthcare providers' duty to maintain confidentiality; and

    f.     InteliChart's actions diminished the value of Plaintiffs and Class Members' personal Health Information.

222.     In violating the ECPA, InteliChart's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiff and a recklessly negligent or callous indifference to Plaintiffs' and Class Members' protected rights under both state and federal law.  Indeed, InteliChart not only intentionally harmed Plaintiffs and Class

Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy.  Specifically:

a.  InteliChart knew it had a duty to safeguard and keep confidential Plaintiffs' and Class Members' Protected Health Information under HIPAA, the patient-provider relationship, and their express promises to Plaintiffs and Class Members;

b.  InteliChart knew that Plaintiffs and Class Members reasonably expected their communications with their healthcare providers to remain private;

c.  InteliChart knew that Plaintiffs' and Class Members' communications involved private and sensitive matters concerning Plaintiffs' and Class Members' healthcare;

d.  InteliChart knew it was prohibited by law from intercepting and disclosing Plaintiffs' and Class Members' communications;

e.  InteliChart knew that Google used the patient data that it was receiving via Google Analytics for marketing purposes;

f.  InteliChart knew that it was required to sign a business associate agreement with any tracking technology vendor with whom InteliChart was sharing patient data;

g.  InteliChart knew that its use of the tracking technology at issue violated its duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

h.  InteliChart nonetheless knowingly and deliberately intercepted and disclosed to third-party advertisers Plaintiffs' and Class Members' Protected Health Information without Plaintiff's and/or Class Members' consent, in a knowing violation of the ECPA;

i. InteliChart carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' and Class Members' private Protected Health Information at Plaintiffs' and Class Members' expense and for InteliChart's own financial gain; and

j. InteliChart's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' and Class Members' Protected Health Information under the guise of offering healthcare services to Plaintiffs and Class Members.

223. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

224. Plaintiffs, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT II

### Breach of Fiduciary Duty

221. Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

222. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

223. Under North Carolina law, healthcare providers like InteliChart have a fiduciary duty to maintain the confidentiality of patients' non-public health information. *Weddle v. WakeMed*, No. 22 CVS 13860, 2023 WL 8369786, at *7 (N.C. Super. Dec. 4, 2023) *Allen v. Novant Health, Inc*., No. 1:22-CV-697, 2023 WL 5486240, at *5 (M.D.N.C. Aug. 24, 2023).

224. Plaintiffs shared communications within the InteliChart Patient Portal for the purpose

of receiving medical care.

225.    Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with InteliChart's Patient Portal, including communications exchanged on the login page and inside the Portal when they took actions such as messaging doctors, confirming appointments, and reviewing test results.

226.    Contrary to its duties as a healthcare provider, InteliChart deployed pixel code to disclose and transmit Plaintiffs' and Class Members' Protected Health Information and the contents of their communications with their doctors to Google.

227.    InteliChart's disclosures of Plaintiffs' and Class Members' Protected Health Information were made without their knowledge, consent, or authorization.

228.    The harm arising from a breach of patient-provider confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

229.    As a direct and proximate cause of Intelichart's unauthorized disclosures of patients' Protected Health Information and communications, Plaintiffs and Class Members suffered, at minimum, the following damages:

> a.    General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;
>
> b.    Sensitive and confidential information including patient status and appointments that Plaintiffs and Class Members intended to remain private is no longer private;
>
> c.    InteliChart eroded the essential confidential nature of the doctor-patient and provider-patient relationship;
>
> d.    InteliChart took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members'

knowledge, consent, or authorization and without sharing the benefit of such value; and

e. Loss in the value Plaintiffs' and Class Members' Protected Health Information.

230. InteliChart collected Protected Health Information from Plaintiffs and Class Members under the guise of keeping this information private. InteliChart collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties.

231. Plaintiffs and Class Members would not have used InteliChart's services if they had known that InteliChart would collect, use, and disclose this information to third parties.

232. InteliChart unjustly retained those benefits at the expense of Plaintiffs and Class Members because InteliChart's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

233. The benefits that InteliChart derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for InteliChart to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged herein.

234. InteliChart should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that it received, and such other relief as the Court may deem just and proper.

## COUNT III

### Negligence

235. Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

61

236. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

237. Under North Carolina law, to state a negligence claim a plaintiff must show (1) a legal duty; (2) the breach thereof; and (3) an injury proximately caused by the breach. *Rodriguez v. FastMed Urgent Care, Inc*., No. 24CV008555-310, 2025 WL 916910, at *3 (N.C. Super. Mar. 25, 2025).

238. Under North Carolina law, it is "is well established that hospitals and doctors in their employ owe their patients a duty to exercise the degree of care that a reasonable person would in similar circumstances to prevent an unreasonable risk of harm to their patients." *Weddle v. WakeMed Health & Hosps*., No. 22 CVS 13860, 2023 WL 8369786, at *3 (N.C. Super. Dec. 4, 2023). This duty encompasses the existence of a "duty to maintain privacy" in a patient's "confidential medical records." *Acosta v. Byrum*, 180 N.C. App. 562, 568 (2006); *Rodriguez v. FastMed Urgent Care, Inc*., No. 24CV008555-310, 2025 WL 916910, at *4 (N.C. Super. Mar. 25, 2025) ("[O]ur our Court of Appeals unambiguously recognized that healthcare providers owe a general duty of care to patients regarding the maintenance of their confidential information.").

239. Indeed, both HIPAA and InteliChart's own internal policies prohibit InteliChart from sharing patients' Protected Health Information with third-party advertising companies like Google without patients' express written consent from patients.

240. It was foreseeable to InteliChart that deploying Google Analytics on its Patient Portals would result in the patients' Protected Health Information being shared with Google. By deploying Google Analytics inside its Patient Portals, InteliChart acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and the Class Members' PHI.

241. InteliChart also had a duty to notify Plaintiffs and Class Members within a reasonable time frame of any breach to the confidentiality and security of their PHI. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect the confidentiality of their PHI and to mitigate the harm caused by InteliChart's conveyance of their PHI to Google.

242. InteliChart owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom InteliChart knew or should have known would suffer injury-in-fact from InteliChart's deployment of Google Analytics inside its Patient Portals.

243. The risk that Google would access, exploit, and misuse Plaintiffs' and Class Members' PHI was foreseeable. Given that Intelichart holds vast amounts of PHI, and that Google warns health care systems not to share health data with it via Google Analytics, InteliChart was on notice of the need to protect Plaintiffs' and Class Members' PHI from unauthorized disclosures via analytics technologies.

244. PHI is highly valuable, and InteliChart knew or should have known the risks in obtaining, storing, handling, transmitting, and using Plaintiffs' and Class Members' PHI, and the importance of exercising reasonable care in the handling and protection of Plaintiffs' and Class Members' PHI.

245. InteliChart breached its duty of reasonable care to Plaintiffs and Class Members in deploying Google Analytics on its Patient Portals and by failing to supervise its employees, agents, contractors, and vendors in the acquisition, handling, and securing of the Plaintiffs' and Class Members' PHI. InteliChart further breached its duty of reasonable care to Plaintiffs and Class Members by sharing their PHI with Google, which actually and proximately caused injuries to Plaintiffs and the Class Members.

246. InteliChart also breached its duty of care by failing to provide reasonable and timely notice to Plaintiffs and the Class Members that their PHI had been shared with Google, which actually and proximately caused additional injuries to Plaintiffs and Class Members.

247. As a direct and traceable result of InteliChart's negligence, Plaintiffs and Class Members have suffered damages, including monetary damages, increased risk of future harm, and loss of privacy.

248. InteliChart's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the improper disclosure of PHI, lost value of their PHI, and lost time and money incurred to mitigate this improper disclosure that resulted from and were caused by InteliChart's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

249. But for InteliChart's wrongful and negligent breach of the duties it owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured. These injuries were the reasonably foreseeable result of Defendant's breach of its duties. InteliChart knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiffs and Class Members to suffer the foreseeable harm associated with the exposure of their PHI.

250. Had Plaintiffs and Class Members known that InteliChart would not adequately protect their PHI, Plaintiffs and Class Members would not have entrusted Defendant with their PHI.

251. Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy with respect to their Protected Health Information and were accordingly entitled to protection of this Information against the acquisition and disclosure of their personal health information by unreasonable means.

252. InteliChart had notice and knew that its deployment of third-party cookies on its Patient Portals, where Plaintiff's and Class members shared their Protected Health Information, would cause injury to Plaintiffs and Class Members.

253. As a proximate result of InteliChart's acts and omissions, Plaintiffs' and Class Members' Protected Health Information was subject to intrusion, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

    *a.*    General damages for invasion of their privacy rights in an amount to be

determined by a jury without reference to specific pecuniary harm;

b.      Sensitive and confidential information including patient status and appointment status that Plaintiffs and Class Members intended to remain private is no longer private;

c.      InteliChart eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

d.      InteliChart took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit; and

e.      Loss in the value of Plaintiffs' and Class Members' Protected Health Information.

254.    Plaintiffs and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of InteliChart's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

## COUNT V

### Breach of Contract

255.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

256.    Plaintiffs bring this claim on behalf of themselves and all members of the Class.

257.    Under North Carolina law, the elements of a breach of contract claim are (1) the existence of a valid contract, and (2) breach of the terms of the contract. *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 276 (2019).

65

258.     InteliChart promised in the Terms and Conditions that it required patients to accept that it would protect the privacy of patients' Protected Health Information and that it would obtain patients' express consent before sharing their Protected Health Information with any third party.

259.     Specifically, Between March 2, 2020, and March 11, 2025, the Terms and Conditions that InteliChart offered patients who accessed its Patient Portals promised Plaintiffs and Class Members that InteliChart would never share their Protected Health Information with third parties without Plaintiffs' and Class Members' express consent.  Specifically, InteliChart's Terms and Conditions assured patients that "InteliChart will not share your information in a form that would be reasonably likely to be personally identifiable without your explicit and prior permission."

260.     Likewise, between March 2, 2020, and March 11, 2025, InteliChart's Terms and Conditions also promised patients that "[t]he security of your information is of utmost importance to InteliChart."  InteliChart further promised in these Terms and Conditions that "InteliChart will not share your information in a form that would be reasonably likely to be personally identifiable without your explicit and prior permission."  InteliChart also promised that any vendor that it shared patients' data with would comport with "applicable law" and "InteliChart's HIPAA Policies and Procedures and any related internal privacy and security policies."

261.     Plaintiffs and Class Members are patients who (1) have not clicked to accept the Terms and Conditions that InteliChart unilaterally modified on March 12, 2025, and who (2), prior to March 12, 2025, accessed the InteliChart Patient Portals by logging  in and out of the password-protected Portals to access medical records, view lab results, communicate with their doctors, confirm appointments, and pay medical bills.

262.     Plaintiffs and Class Members who used the InteliChart Patient Portal did so in reasonable reliance on InteliChart's promises that it would not share their Protected Health Information without their express consent and that InteliChart would guard the "security" of their Protected Health

66

Information.

263.    In breach of this agreement, InteliChart regularly shared Plaintiffs' and Class Members' Protected Health Information (including their patient status and other health data) with Google without Plaintiffs' and Class Members' consent. InteliChart's unauthorized sharing of Plaintiffs' and Class Members' Protected Health Information not only violated HIPAA but it also violated InteliChart's own internal privacy policies.

264.    Among other things, InteliChart breached the terms of the agreement between the parties by disclosing, via the deployment of Google Analytics on and inside its patient portal, (a) Plaintiffs' and Class Members' patient status, (b) Plaintiffs' and Class Members' logins to the Patient Portals, (c) the nature of Plaintiffs' and Class Members' health concerns, (d) Plaintiffs' and Class Members' bill payments to their healthcare providers, (e) when Plaintiffs and Class Members sent messages to their doctors, (f) the pages that Plaintiffs and Class Members viewed inside the InteliChart Patient Portals; (g) the dates and times that patients logged into and logged out of InteliChart's Patient Portals; and (h) the contents of communications that Plaintiffs and Class Members made within the Portals.

265.    Along with this information, InteliChart also disclosed personally identifying information such as Plaintiffs' IP addresses, browser fingerprint, and persistent cookie identifiers that specifically identified Plaintiffs and Class Members to Google.

266.    The Protected Health Information that InteliChart disclosed to Google included data about the past, present, and future provision of care to Plaintiffs and Class Members, such as when they made appointments or messaged their doctors. The Protected Health Information that InteliChart disclosed to Google also contained data about the past, present, and/or future payment of medical bills by Plaintiffs and Class Members. The Protected Health Information that InteliChart also disclosed Plaintiffs' and Class Members' patient status to Google.

267.     As a consequence of InteliChart's breach of the agreement that it had with Plaintiffs and Class Members, Plaintiffs and Class Members suffered, at minimum, the following damages:

    a. Nominal damages for breach of contract;

    b. General damages for invasion of Plaintiffs' and Class Members' privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

    c. Sensitive and confidential information including patient status and appointments that Plaintiffs and Class Members intended to remain private is no longer private;

    d. InteliChart eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

    e. InteliChart took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit; and

    f. Loss in the value of Plaintiffs' and Class Members' Protected Health Information.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request relief against InteliChart as set forth below:

    a. Certifying the Class and appointing Plaintiffs as the Class's representative;

    b. Finding that InteliChart's conduct as alleged herein was unlawful;

    c. Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining InteliChart from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent; requiring InteliChart to

implement adequate procedures for ensuring the confidentiality of patients' health information; mandating that InteliChart hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that InteliChart provide written verifications on a quarterly basis to the court and counsel for Plaintiffs and Class Members in the form of a declaration under oath that the above steps.

d.    Awarding statutory damages of $5,000 per violation for InteliChart's violation of the Electronic Communications Privacy Act;

e.    Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

f.    Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g.    Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

h.    Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

i.    Awarding costs of suit; and

j.    Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: November 14, 2025

Respectfully submitted,

/s/ *Matthew E. Lee*

Matthew E. Lee
Jeremy R. Williams
**LEE SEGUI, PLLC**
900 W Morgan St
Raleigh, NC 27603
855-496-7500
mlee@leesegui.com
jwilliams@leesegui.com

J. Gerard Stranch
**STRANCH, JENNINGS, & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gstrach@stranchlaw.com

Lynn A. Toops
**COHEN & MALAD, LLP**
One Indiana Square, #1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com

Foster C. Johnson
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney Street, Suite 3460
Houston TX 77010
(713) 655-1101
fjohnson@azalaw.com
ahmad@azalaw.com
tfrashier@azalaw.com

Samuel J. Strauss
**STRAUSS BORRELLI LLP**
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@straussborrelli.com

*COUNSEL FOR PLAINTIFF, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARY SITUATED*

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2025, the foregoing PLAINTIFFS' MOTION TO SEAL was filed electronically using the Court's ECF system, which will service a copy of the same via email on all counsel of record.

*/s/ Matthew E. Lee*
Matthew E. Lee
